# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **MICHAEL J. CONWAY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:08-cv-201** |
| | § | **(Schneider, J./Bush, M.J.)** |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

M. Todd Welty
Texas State Bar No. 00788642
Laura L. Gavioli
Texas State Bar No. 24055538
Sonnenschein Nath & Rosenthal LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201-1858
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
twelty@sonnenschein.com
lgavioli@sonnenschein.com

ATTORNEYS FOR PLAINTIFF
MICHAEL J. CONWAY

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................ 1

II.   RESPONSE TO DEFENDANT'S STATEMENT OF ISSUES. ...................................... 1

III.  STATEMENT OF CONTESTED MATERIAL FACTS. .................................. 2
      A.    Objections to Evidence Offered By The Government. .......................................... 2
      B.    Response To Defendant's Statement of Undisputed Facts. ................................. 2
            1.    December 2000. .............................................................................. 3
            2.    September 11, 2001. ....................................................................... 5
            3.    January 15, 2002. ........................................................................... 7
            4.    Early Fall 2002 - November 2002. ................................................ 8
            5.    November 2002 - May 2003. .......................................................... 9
            6.    Assessment. .................................................................................. 10
      C.    Contested Material Facts Which Preclude Summary Judgment. .......................... 12

IV.   LAW AND ARGUMENT ......................................................................... 13
      A.    This Case Is Inappropriate For Summary Judgment. ......................................... 13
      B.    The Government Bears The Burden Of Proof And Has Not Met This Burden. .... 15
      C.    The Tax Periods At Issue Must Be Considered Separately. ................................ 16
      D.    The Government Did Not Make A Timely Assessment. In Any Event,
            Factual Disputes On This Issue Entirely Preclude Summary Judgment. ............. 16
      E.    Conway Is Not A Responsible Person For The Tax Periods At Issue.
            However, Factual Disputes Preclude Summary Judgment On This Issue. ........... 17
            1.    Restrictions On Payment Of Excise Taxes For The
                  Third Quarter Of 2000. ................................................................... 18
            2.    Restrictions On Payment Of Excise Taxes For The Third
                  And Fourth Quarters Of 2001. ....................................................... 19
      F.    Conway Acted With Reasonable Cause And Did Not Act Willfully,
            Precluding Summary Judgment On This Novel, Mixed Question
            Of Fact And Law. ........................................................................................... 21
            1.    Conway Did Not Act Willfully Or Recklessly. ....................................... 22
            2.    Conway Received Advice Not To Pay The Taxes As They
                  Came Due, and At All Times Acted With Reasonable Cause. ................ 24
            3.    Conway Acted With Reasonable Cause And Not Willfully
                  Regarding National's Unpaid Excise Taxes For The
                  Third Period Of 2000. .................................................................... 26
            4.    Conway Acted With Reasonable Cause And Not Willfully
                  Regarding National's Unpaid Excise Taxes For The Third
                  And Fourth Quarters Of  2001. ....................................................... 27

V.    CONCLUSION AND PRAYER FOR RELIEF ................................................. 30

## I.    INTRODUCTION

The events of this case took place at an extraordinary time in the airline industry following the terrorist attacks of September 11, 2001.  In that time period, Congress took the unprecedented step of using federal excise taxes to provide a short-term cash infusion to airlines to help them stay afloat.  Because of this unique relief, this case is unlike any trust fund recovery penalty case under 26 U.S.C. § 6672 to come before it.  The evidence shows that Conway cannot be held liable for National Airlines' unpaid excise taxes.  During National's bankruptcy and pursuant to advice of counsel, Conway took all reasonable steps to ensure that National's federal excise taxes were paid prior to the company's liquidation.  In addition, because significant factual issues persist about whether the IRS made a timely assessment for the amounts at issue, the Government is procedurally barred from pursuing Conway for any of National's excise taxes.

Summary judgment should not be granted in this case.  Factual disputes exist regarding all dispositive issues, including 1) the timeliness and validity of the IRS's penalty assessments, 2) Conway's authority to pay the taxes at issue, and 3) Conway's reasonable cause and lack of willfulness regarding the liabilities.

## II.    RESPONSE TO DEFENDANT'S STATEMENT OF ISSUES.

The appropriate inquiry under Fifth Circuit case law is as follows:

1A.    Whether the Government has conclusively demonstrated that Conway was a person responsible for collecting, accounting for, or paying over excise taxes collected by National for the third quarter of 2000?

1B.    Whether the Government has conclusively demonstrated that Conway was a person responsible for collecting, accounting for, or paying over excise taxes collected by National for the third and fourth quarters of 2001?

2A.    Whether the Government has conclusively demonstrated that Conway **willfully and without reasonable cause** failed to collect, account for, or pay over excise taxes collected by National for the third quarter of 2000?

2B.   Whether the Government has conclusively demonstrated that Conway **willfully and without reasonable cause** failed to collect, account for, or pay over excise taxes collected by National for the third and fourth quarters of 2001?

The Court should hold that the answer to all of these questions is "no."  Further, the Government in its "issues presented" does not seek summary judgment that the assessments in this case were timely and valid.  The timeliness and validity of the assessments is a predicate issue which must be resolved before any determination of Conway's liability for the trust fund recovery penalty under 26 U.S.C. § 6672.  Without a timely and valid assessment, the IRS has no ability to seek this penalty from Conway.  Therefore, summary judgment is inappropriate on the merits because this predicate issue is in dispute.

## III.   STATEMENT OF CONTESTED MATERIAL FACTS.

### A.   Objections to Evidence Offered By The Government.

The Court should disregard the evidence presented by the Government regarding the Conway's assessment since it was not properly disclosed under Fed. R. Civ. P. 37(c)(1).  The Government has offered two affidavits, but neither affiant appears in the Government's initial disclosures.[1]  Moreover, documents attached to one of the affidavits were not produced during discovery.[2]  As such, the affidavits and documents are not competent summary judgment evidence.[3]  The Government's failure to produce these materials during discovery was prejudicial to Conway.[4]  Conway has not had a fair opportunity to test this evidence.

### B.   Response To Defendant's Statement of Undisputed Facts.[5]

---

[1] *See* Government's Exhibits 15 and 29 (including attachments 2 and 3 to Exhibit 29).

[2] *See* Attachments 2 and 3 to Government Exhibit 29.

[3] *See* Fed. R. Civ. P. 37; *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 650 n.3 (5th Cir. 1992) ("[T]he admissibility of evidence on a motion for summary judgment is subject to the same standards and rules that govern admissibility of evidence at trial.") (citation omitted); *Montes v. Phelps Dodge Indus., Inc.*, 481 F.Supp.2d 700, 711 (W.D. Tex. 2006) ("Evidence that was not produced during discovery may not be admitted at trial unless that error is harmless.") (citations omitted).

[4] Conway first requested this information seven months ago on February 23, well before the deadline for expert witnesses.  In response, the Government informed Conway that it had no further documents supporting the assessment.  *See* Ex. P70, Plaintiff's First Informal Document Requests and Government's Response.

[5] In the following section, Conway notes which facts are disputed as they are discussed.

Many of the facts listed as "undisputed" in Defendant's Statement are either in dispute or are merely generalized assertions.[6] "Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient" to support a motion for summary judgment.[7]

During National's bankruptcy,[8] National was delinquent for three types of excise taxes, all of which were subject to differing treatment under bankruptcy rules—taxes for the third quarter of 2000, prior to National's filing for bankruptcy (the "pre-petition" taxes), for the two quarters following September 11, 2001 (the "9/11" taxes), and for the second quarter of 2002 (the "2002 post-petition" taxes).[9]  In the period between December 2000 and May 2003, while National was a debtor-in-possession in the bankruptcy proceeding, Conway's handling of these three types of taxes demonstrates that he took all steps to ensure the taxes would be paid.

### 1.    December 2000.

Due to liquidity problems caused by industry-wide high fuel prices and a delay in obtaining an FAA certificate on start-up, National filed for Chapter 11 bankruptcy in December 2000.[10]  At this time, Conway had every belief that the airline would successfully reorganize in

---

[6] For example, the Government's citations to witnesses' characterizations of Conway as an "ultimate decisionmaker" and the "number one guy in charge" are both unspecific and legally meaningless.  Also, the Government cites to no authority for its assertion that "Conway reported to no one[.]"  Like any CEO of a company in bankruptcy, Conway was subject to the supervision of National's board of directors, National's restructuring committee, and the Nevada bankruptcy court.  Ex. P1, Plaintiff's Response to Government's Interrogatory 3 and 7.  Further references to "Ex." throughout refer to exhibits attached to the Declaration of Michael J. Conway, attached.

[7] *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citations omitted).  *See also Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law" are not adequate evidence for summary judgment).

[8] *In re National Airlines, Inc.,* No. 00-19258 (Bankr. D. Nev.).  Further references to "Bankr. Rec. Doc. No." throughout refer to documents from National's Nevada bankruptcy case.

[9] This tax period is not at issue.  However, Conway's handling of this period in contrast to the 9/11 periods demonstrates his understanding at the time that the 9/11 periods were different and not subject to the same priority of payment as ordinary excise taxes.

[10] Ex. P2, Government's Response to Request for Admissions 2 (date of bankruptcy filing); Ex. P3, Nakano Dep. 53:8-13 (describing FAA delay); Ex. P4, Conway Dep. 18:22-19:4, 24:13-17 (fuel prices); Ex. P5, Nakashima Dep. 35:10-13 (same); Ex. P6, Frost Dep. 43:12-24 (same).  While the date of the bankruptcy is undisputed, National's business model and overall potential for profit are disputed.  *See* Government's Statement of Undisputed Facts at C.  Several witnesses testified that National had a good business plan but poor timing, in part due to September 11.  Ex. P6, Frost Dep. 42:20-44:6; Ex. P3, Nakano Dep. 52:2-55:8.

bankruptcy.[11]   In fact, at America West in the early 1990s, Conway and National's Chief Financial Officer, Ray Nakano, were responsible for what is historically recognized as one of the most successful bankruptcy reorganizations of any airline.[12]   Moreover, bankruptcy in the airline industry is unfortunately very common.[13]

National timely filed its excise tax return for the third quarter of 2000 on November 30, 2000[14] and submitted a check to the IRS for payment at that time.[15]   National filed for bankruptcy on December 6, 2000, before the IRS had submitted the check for payment.[16]   As part of the bankruptcy proceeding, National was advised to close most of its bank accounts.[17] National closed the account on which the check was drawn, and it was returned unpaid.[18]

When he learned of the unpaid check,[19] Conway had no ability to correct the problem. While Conway was the founder, CEO and Chairman of the Board of National, his authority

---

[11] Ex. P4, Conway Dep. 93:15-17.

[12] Ex. P4, Conway Dep. 152:13-20; Ex. P7, Rodney Dalton, *United Better In Red Than Dead*, The Australian, Dec. 10, 2002, at 39 ("Since deregulation of the industry in 1978, only Continental and America West have survived from among the 11 major airlines to have gone bankrupt—including TWA three times."). In fact, America West had unpaid excise taxes during its bankruptcy, all of which were eventually satisfied. Ex. P3, Nakano Dep. 17:4-17; Ex. P6, Frost Dep. 107:17-108:19 ("The government got all the excise taxes from that bankruptcy plus interest.").

[13] Since the airline industry was deregulated in 1978, there have been more than 100 bankruptcies. *See* Ex. P8, Air Transport Association, *U.S. Airline Bankruptcies and Service Cessations*, *available at* http://www.airlines.org/economics/specialtopics/USAirlineBankruptcies.htm.

[14] Ex. P9, CONTX04763 (return); Ex. P6, Frost Dep. 28:18-20 (timely filing).

[15] Ex. P10, CONTX04765 (check).

[16] The date on which the IRS submitted the check for payment is disputed. *See* Ex. P2, Government's Response to Request for Admission 9. The check was submitted sometime after the IRS received it on December 4, 2000. Ex. P11, CONTX04756 (IRS notice showing date received); Ex. P12, CONTX04758 (returned check).

[17] Ex. P3, Nakano Dep. 24:22-25:19 (discussing closing the accounts on advice of counsel); Ex. P6, Frost Dep. 22:25-23:15 (discussing closing of accounts); Ex. P13, CONTX06593 (letter to IRS regarding unpaid check); Ex. P14, DOJ00179 (IRS Interview of Kevin Tourek, referencing advice received). A debtor-in-possession is prohibited from using "cash collateral" for any purpose without the bankruptcy court's approval. 11 U.S.C. § 363(c)(2)(B). "Cash collateral" includes deposit accounts like National's operating account at Nevada State Bank, the account on which the check for the excise taxes for the third quarter of 2000 was drawn. *See* 11 U.S.C. § 363(a). When a voluntary petition for reorganization is filed, the Chapter 11 Trustee Manual provides that the trustee "should ensure that the debtor has closed its former bank accounts and established separate debtor in possession bank accounts." Ex. P15, United States Trustee Manual, Chapter 3-3.1.3 at 32 (Oct. 1998).

[18] Ex. P11, CONTX04756 (IRS notice showing date received); Ex. P12, CONTX04758 (check); Ex. P13, CONTX06593 (letter to IRS regarding unpaid check).

[19] The Government disputes the fact that Conway learned of the unpaid debt during the bankruptcy. *See* Government's Statement of Undisputed Facts at B. *Contra* Ex. P1, Plaintiff's Response to Government Interrogatory 2.

changed significantly once National filed for Chapter 11 bankruptcy.[20]  This debt was classified as a pre-petition liability, which Conway had no ability to pay without the bankruptcy court's approval.[21]  National listed the pre-petition excise taxes as a liability of the airline in its later bankruptcy pleadings, including the plan for reorganization.[22]  Conway also included this liability in National's financial models for potential investors.[23]  Throughout the bankruptcy, Conway directed National's employees to keep the IRS fully informed of the liabilities and of National's efforts to repay the debts, and met with IRS representatives on the issue.[24]  In fact, the Government has not alleged that Conway or National in any way mishandled the reporting and treatment of this liability in the bankruptcy proceeding.[25]

### 2.    September 11, 2001.

At the time of September 11, 2001, National was successfully reorganizing in bankruptcy.[26]  A plan of reorganization was well underway,[27] and it was filed on November 9, 2001.[28]  The terrorist attacks devastated the airline industry in general and National in particular.[29]  In addition to dealing with a bankruptcy and existing industry-wide problems like high fuel prices, National now confronted a multi-day "ground stop" of all airline traffic.[30]  In

---

[20] Ex. P1, Plaintiff's Response to Interrogatory 7.  This issue is disputed.  *See* Government's Statement of Undisputed Facts at C.

[21] *See* Section IV.E.1. for legal discussion of this issue.

[22] *See* Ex. P16, Bankr. Rec. Doc. No. 960 at 10.  This is undisputed.  *See* Government's Statement of Undisputed Facts at B.

[23] Ex. P17, CONTX06243.

[24] Ex. P4, Conway Dep. 117:7-23.  Discovery is incomplete on this issue.  *See* Rule 56(f) Declaration.

[25] The Government has refused to answer written discovery on this issue, but there is no allegation of misconduct in the publicly-available pleadings in the bankruptcy proceeding.

[26] Ex. P6, Frost Dep. 103:20-104:1 (National was current on its excise taxes prior to September 11); Ex. P14, DOJ00179 (Tourek's recollection of same).

[27] Ex. P17, CONTX06243 (financial model dated 7/2/01 for potential investors, discussing plan of reorganization).

[28] Ex. P18, Bankr. Rec. Doc. No. 755.

[29] September 11's effect on the airlines is undisputed.  *See* Government's Statement of Undisputed Facts at E.

[30] Ex. P4, Conway Dep. 30:24-32:9 (discussing ground stop); Ex. P6, Frost Dep. 47:4-16 (same); Ex. P5, Nakashima Dep. 52:19-53:4 (fuel prices and passenger problems following 9/11); Ex. P3, Nakano Dep. 62:12-20 (same); *See* Ex. P19, Micheline Maynard, *Airlines' Bad Year Is Suddenly Looking Much, Much Worse*, N.Y. Times, Sept. 16, 2001, at 6.

the following weeks and months, National faced great uncertainty regarding what new safety regulations would be imposed[31] and whether passengers would feel safe enough to fly again.[32]

On or around September 11, 2001, the IRS sent word to the airlines that excise tax payments which were immediately due would be deferred.[33]  On September 22, 2001, Congress passed the Air Transportation Safety and System Stabilization Act (the "Stabilization Act").[34] Section 301(a)(1) extended the due date for payment of federal excise taxes to mid-November, and gave the IRS discretion to extend the deferral period to January 15, 2002,[35] which the IRS used.[36]  Numerous comments from legislators made clear that the intent of the law was to keep the industry afloat and to allow airlines to use collected excise taxes for operating expenses or working capital.[37]  This also was the understanding within the industry and within National itself.[38]  In keeping with the Act's purpose, National used the excise taxes it had collected for the third and fourth quarters of 2001 for operating expenses.[39]

---

[31] Immediately after September 11, the Federal Aviation Administration grounded all planes and imposed new security regulations.  Airlines were unsure what further security regulations would be imposed.  *See* Ex. P19, Micheline Maynard, *Airlines' Bad Year Is Suddenly Looking Much, Much Worse*, N.Y. Times, Sept. 16, 2001, at 6 (noting the new and unexpected expenses of tightened security).

[32] *Id.*; Ex. P6, Frost Dep. 47:4-16.

[33] *See* Ex. P20, CONTX04416 (National Restructuring Committee minutes dated Sept. 14, 2001).

[34] Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, H.R. 2926, 107th Cong. (2001).

[35] Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, H.R. 2926, 107th Cong., § 301(a)(1) (2001), enacted as 49 U.S.C. § 40101.

[36] I.R.S. Notice 2001-77, 2001-2 C.B. 576, 2001 WL 1421850.

[37] *See* Ex. P21, HOUSE DEBATES, PASSES AIRLINE RELIEF BILL, 2001 TNT 188-46 (Remarks of Rep. Don Young, a co-sponsor of the House version of Stabilization Act, H.R. 2926 , "[the Act is] the first critical step toward addressing the financial burdens that last week's terrorist attacks put on our transportation and related industries and their employees") (Remarks of Rep. Dick Gephardt, "It is a bill to keep these airlines going.  They are operating tonight at about 30 percent of the capacity that they had the day before this event happened").

[38] Ex. P6, Frost Dep. 46:19-47:25, 103:3-18; Ex. P3, Nakano Dep. 61:25-62:6, 64:4-15; Ex. P4, Conway Dep. 32:3-20, 62:1-7.  This fact is disputed.  *See* Government's Statement of Undisputed Facts at E.
A November 14, 2001 Associated Press articles describes:
> The nation's airlines hope to postpone paying roughly $4 billion in taxes until Jan. 15 so they can use the cash for daily operations as travel demand remains sluggish after the Sept. 11 terror attacks. Under an aid package approved by Congress after the attacks, the Treasury Department has already postponed about $2 billion in airline taxes through Nov. 15. Carriers asked Treasury Secretary Paul O'Neill to defer semi-monthly taxes of about $500 million for an additional two months in a letter dated Nov. 2 and signed by several industry groups. "We're looking for cash flow assistance through the end of the year," said John Heimlich, an economist at the Air Transport Association, one of the groups that sent the letter. "Not paying the taxes will help."

### 3.    January 15, 2002.

Excise taxes for the third and fourth quarters of 2001 became due on January 15, 2002.[40] Facing financial problems following September 11, National was unable to make a large (roughly $8 million) excise tax payment in January 2002.[41]   Following counsel's advice, National filed returns for the third and fourth quarters of 2001 without payment but with requests for extension of time to pay, on Forms 1127.[42]   The requests explained National's situation and stated National's intent to fully satisfy the liabilities.[43]

While National was a debtor-in-possession, National only had authority to pay its day-to-day operating expenses in the ordinary course of business.[44]   For any extraordinary payments, bankruptcy court approval was needed.[45]   Payment of the 9/11 taxes plainly qualified as an extraordinary payment, and, as such, Conway had no authority to pay these taxes without the bankruptcy court's approval.[46]   However, Conway kept the IRS, National's board of directors, and the Nevada bankruptcy court informed of the status of these taxes.[47]

---

Ex. P.22, Brad Foss, Associated Press, *Carriers Seek New Tax Delay,* Philadelphia Inquirer, Nov. 14, 2001 (emphasis added).

[39] Ex. P3, Nakano Dep. 64:21-65:5; Ex. P6, Frost Dep. 109:24-110:4.  This issue is disputed.  *See* Ex. P2, Government's Response to Request for Admission 4.

[40] I.R.S. Notice 2001-77, 2001-2 C.B. 576, 2001 WL 1421850.

[41] Ex. P3, Nakano Dep. 62:8-20.  This is also plain from National's monthly operating report filed with the Nevada bankruptcy proceeding for the month of January 2002, where the company's liabilities of $215,390,705 exceed the company's assets of $74,814,661.  Ex. P23, Bankr. Rec. Doc. No. 1022.

[42] *See* Ex. P24, Frost interview with IRS, DOJ00508 at 519-22, 524-26 (discussing advice of counsel); Ex. P25, CONTX04767 & 69 (letter, Form 1127, and third quarter 2001 return); Ex. P26, CONTX04776 & 79 (letter, Form 1127, and fourth quarter 2001 return).  The filing of the extension requests is undisputed.  *See* Government's Statement of Undisputed Facts at B.

[43] *Id.*

[44] Ex. P3, Nakano Dep. 100:11-20.  *See* section IV.E.2. for legal discussion.  This is why the Government's Exhibit 15 is legally meaningless.  National was authorized to pay day-to-day expenses, which is what is reflected in Government Exhibit 15.  The 9/11 excise taxes were not ordinary-course payments; they had to be dealt with as administrative expenses later in the bankruptcy proceeding.

[45] *Id.*; Ex. P3, Nakano Dep. 97:21-98:6; Ex. P4, Conway Dep. 35:18-36:11; 148:22-151:21.

[46] Ex. P4, Conway Dep. 35:18-36:11; 148:22-151:21.

[47] Ex. P14, DOJ00179; Ex. P27, DOJ-NB-00854 (schedule showing amounts due on the date of shutdown which National gave to the IRS); Ex. P28, CONTX04270; Ex. P29, CONTX04251; Ex. P4, Conway Dep. 117:7-23; Ex. P23, Bankr. Rec. Doc. No. 1022 (monthly tax statement, n. 2); Ex. P1, Plaintiff's Response to Interrogatory 3 and 7; Rule 56(f) Declaration.

National's plan of reorganization was confirmed in March 2002.[48]  The plan relied on National's ability to obtain loan guarantees from the Air Transportation Safety Board ("ATSB"), a program set up under the Stabilization Act.[49]  The IRS did not object to the plan.[50]

### 4.    Early Fall 2002 - November 2002.

National made every effort to obtain ATSB funding, but its application was eventually denied in August 2002.[51]  After the ATSB application was denied, Conway worked diligently to pursue other funding avenues to allow National to reorganize successfully.[52]  In addition to the existing problems facing National described above, America West had already obtained ATSB funding,[53] and took actions in the marketplace which National believed to be predatory.[54]

National's liquidity problems grew during this period.  Conway took salary cuts in 2002 and 2003 to give more working capital to National.[55]  National became delinquent on its payments for federal excise taxes for the second quarter of 2002 and filed a request for an extension of time to pay with the IRS.[56]  Nakano began holding daily "cash flow" meetings with the financial officers to determine what day-to-day expenses could be paid.[57]  At board meetings, National's bankruptcy counsel, Craig Hansen, repeatedly advised the board regarding what payments to creditors would be required if National were to shut down.[58]  Hansen never included

---

[48] Ex. P30, Bankr. Rec. Doc. No. 1037.
[49] Ex. P4, Conway Dep. 25:1-3.
[50] Ex. P30, Bankr. Rec. Doc. No. 1037.
[51] Ex. P31, CONTX06760 (Press Release); Ex. P32, CONTX 05701 (Air Transport Association pamphlet showing which airlines obtained ATSB funding).
[52] Ex. P33, CONTX06617; Ex. P31, CONTX06760; Ex. P34, CONTX04268.
[53] Ex. P4, Conway Dep. 38:7-39:6; Ex. P32, CONTX05701 (showing America West's ATSB approval date of 12/28/2001, more than six months before any other airline).
[54] Ex. P4, Conway Dep. 41:3-42:6; Ex. P35, CONTX00115.
[55] *See* Government's Statement of Undisputed Facts at B.
[56] Ex. P36.
[57] Ex. P6, Frost Dep. 105:23-106:20; Ex. P24, DOJ00508.
[58] Ex. P37, CONTX04260; Ex. P34, CONTX04268; Ex. P28, CONTX04270.

the 9/11 taxes on this list.[59]  Conway relied upon Hansen's advice to determine what creditors needed to be paid and in what order.[60]

National closed its doors on November 6, 2002.[61]  In the board meeting held on that day, Hansen advised that National would need to pay excise taxes for the second quarter of 2002.[62] No mention was made of the 9/11 taxes or the pre-petition taxes at issue here.[63]

### 5.    November 2002 - May 2003.

After the shutdown, Conway worked to pay off the list of creditors which counsel advised were the highest priority.[64]  In particular, National made all efforts to pay the pre-petition taxes and the 2002 post-petition taxes.[65]  In February 2003, Nakano sent to the IRS what National believed to be the final payment toward the pre-petition liability.[66]  National had made a series of payments toward the third quarter of 2000, and had used refunds and offsets from other tax periods to pay down the liability.[67]  In addition, National made a series of payments toward the 2002 post-petition taxes, and these were fully paid by February 2003.[68]  By May 2003, National's management reasonably believed that the pre-petition taxes and the 2002 post-petition taxes were paid in full.[69]  No efforts were made to pay the 9/11 taxes because Conway was advised that the 9/11 taxes should be treated differently than the taxes for other periods.[70]

National's bankruptcy case was converted to Chapter 7 in May 2003.[71]  The IRS did not object to the conversion.[72]  In the hearings surrounding the conversion, the bankruptcy court

---

[59] Ex. P4, Conway Dep. 151:22-156:19, 165:2-12, 165:22-166:13.
[60] Ex. P3, Nakano Dep. 101:11-20.
[61] Ex. P38.
[62] Ex. P28, CONTX04270.
[63] *Id.*
[64] Ex. P3, Nakano Dep. 101:11-20; Ex. P4, Conway Dep. 165:22-166:13.
[65] Ex. P3, Nakano Dep. 102:2-11.
[66] Ex. P39, CONTX04984.
[67] *Id.* This is undisputed. *See* Government's Statement of Undisputed Facts at A.
[68] Ex. P40, CONTX04975.
[69] Ex. P3, Nakano Dep. 98:7-99:7; 99:8-25.
[70] Ex. P3, Nakano Dep. 102:2-11; Ex. P4, Conway Dep. 165:22-166:13.
[71] Ex. P41, Bankr. Rec. Doc. No. 1451.

questioned whether the excise taxes were subject to Chapter 11 priority.[73]    Attorneys for the bankruptcy trustee represented that they would examine whether the federal excise taxes were truly trust fund taxes, but would do so after conversion.[74]

          **6.**    **Assessment.**

In cases like the present one, described in 26 U.S.C. § 6672(b)(3), there are three stages to the IRS administrative process—1) audit and proposed assessment,[75] 2) protest and appeals, and 3) assessment.[76]    When the IRS sends a notice of proposed assessment to a taxpayer, the taxpayer has the option of filing a protest.[77]    Conway filed a protest in this case on May 9, 2003.[78]    The case then goes through the IRS's review and appeals process.    When the appeal is closed, the taxpayer receives formal notice.[79]    Under Section 6672(b)(3)(B), the date of that notice to the taxpayer is the date of the IRS's "final administrative determination" of the protest, in this case, March 23, 2006.[80]    The IRS then has 30 days from that date to make an assessment of the trust fund recovery penalty against the taxpayer.[81]    Once that assessment has been made, it is IRS policy to "immediately" send a notice to the taxpayer on Form 3552.[82]

---

[72] The Government has refused to answer written discovery on this issue, but no objections from the IRS appear on the docket sheet of the bankruptcy proceeding.

[73] Ex. P42, Bankr. Rec. Doc. No. 1461.

[74] *Id.*  As shown in the transcript, Conway attended this hearing. In another hearing, the Chapter 7 bankruptcy trustee represented to the court that he believed that National had sufficient funds to pay all Chapter 11 administrative expenses.  Ex. P43, Bankr. Rec. Doc. No. 1455. (This would include the 9/11 taxes.)

[75] In its Statement of Undisputed Material Facts, the Government discusses the date on which Conway received the Notice of Proposed Assessment.  This date is irrelevant to the issue of whether the IRS made a timely or valid assessment here.  The Form 2751 in this case was issued in 2003 at the close of the audit phase of the case, and Conway made a timely protest based on this notice.  The Form 2751 has no bearing on whether the IRS made a timely assessment within the 30-day window set forth in Section 6672(b)(3)(B) after the IRS rejects a taxpayer's protest.

[76] These procedures are described in detail in Ex. P67, Internal Revenue Manual 5.7.6.

[77] I.R.C. § 6672(b)(3).

[78] Ex. P44, CONTX05007.

[79] *See* Ex. P67, I.R.M. 5.7.6.

[80] Ex. P45, CONTX05124.  This is undisputed.  *See* Government's Statement of Undisputed Facts at D.

[81] I.R.C. § 6672(b)(3)(B).

[82] *See* Ex. P67, I.R.M. 5.7.6.4(7); Ex. P46, Government's Response to Request for Admission 28.

In this case, the IRS has prepared a certified transcript of account showing that an assessment was made on March 28, 2006.[83]  Numerous circumstances surrounding the assessment defeat any presumption that this date is correct.  The transcript states that a "jeopardy" assessment occurred on this date.[84]  Jeopardy assessments are rarely used and are subject to special approval procedures within the IRS, none of which were followed here.[85]  In fact, the Government has admitted that there was no jeopardy assessment in this case.[86]

Instead, the circumstantial evidence strongly suggests that the IRS made an untimely or invalid assessment.  There is no admissible documentation establishing the date of assessment beyond the certified transcript and notes in an ICS History Transcript from Carol A. Gabrielli.[87]  Gabrielli, possibly the employee assigned to make the assessments here,[88] was fired for falsifying documents related to trust fund recovery penalty assessments in other cases around the time of the events of this case.[89]  The Merit Systems Protection Board held earlier this year that Ms. Gabrielli is not a credible witness.[90]  Gabrielli also was responsible for retaining the IRS's assessment file, which she recalled was "a big box" in this case.[91]  This file has never been produced, and, by the Government's own admission, is missing.[92]  In addition, Ms. Gabrielli's notes in the ICS History Transcript demonstrate that there were unexplained, suspicious delays in

---

[83] Ex. P47, CONTX00013, CONTX00017, & CONTX00021.

[84] *Id.*

[85] Ex. P68, I.R.M. 1.2.13.1.27, Policy Statement 4-88 (giving four criteria for jeopardy assessment, none of which apply here); Ex. P69, IRM 5.1.4.2 (same). I.R.M. 1.2.13.1.27 and 5.1.4.3 require that the District Director approve a jeopardy assessment, which was apparently not done here.

[86] *See* Ex. P46, Government's Response to Request for Admission 22; Ex. P48, Government's Response to Interrogatory 12.

[87] *See* supra at III.A.

[88] This issue is disputed.  Gabrielli's testimony conflicts with the findings of the Federal Circuit and Merit Systems Protection Board, which both held that she was responsible for assessments similar to the present ones. Ex. P49, Gabrielli Dep. 17:15-24; 24:16-20; 32:25-33:10.  *Contra* Ex. P50, CONTX05841 (Merit Systems Protection Board's finding that Gabrielli "is responsible for processing the trust fund penalties assessment"); Ex. P51, *Gabrielli v. Department of Treasury*, No. 2009-3042 (Fed. Cir. Apr. 1, 2009) (holding that the duties of Gabrielli's division "include making penalty assessments" and that Gabrielli was "the only employee" with this responsibility).

[89] *See* Ex. P50, CONTX05841 (affirming dismissal).

[90] *Id.*

[91] Ex. P49, Gabrielli Dep. 47:17-22; 13:24-14:1; 40:10-12; 16:12-18.

[92] Ex. P52, DOJ00115 at 172-73; Ex. P48, Government Response to Interrogatory 6.

issuing the Forms 3552 Notices of Tax Due and in mailing these notices to Conway.[93]  These

forms are usually mailed immediately after an assessment,[94] but in this case they were mailed on

June 6, 2006,[95] well after the 30-day window of Section 6672(b)(3) had expired.

Moreover, Conway has suffered injury due to the IRS's procedural errors.  The IRS

issued a federal tax lien on all of Conway's assets for the amounts at issue in this case, and failed

to give the statutorily-required notice to Conway prior to doing so.[96]  The illegally issued lien is

shown on Conway's credit report, and Conway must disclose the lien to potential employers.[97]

### C.    Contested Material Facts Which Preclude Summary Judgment.

The parties dispute the following factual issues and mixed questions of law and fact:

- Whether the IRS made a timely and valid assessment against Conway for the periods at issue, and the credibility of the majority of the evidence of the assessment.

- Whether Conway had sufficient authority to pay the specific taxes at issue during National's bankruptcy.

- Whether Conway's authority at National changed due to National's bankruptcy filing.

- Whether Conway had any restrictions on his authority to pay the taxes at issue.

- Whether Conway was advised not to pay the excise tax liabilities at issue as they came due.

- Whether Conway had later-acquired unencumbered funds at his disposal to pay the liabilities at issue.

- Whether Conway reasonably believed that National's liability for the third quarter of 2000 was fully paid when National filed for bankruptcy in December of 2000.

- Whether Conway reasonably believed that National's liability for the third quarter of 2000 was fully paid when National's bankruptcy case was converted to Chapter 7 liquidation in 2003.

---

[93] Ex. P52, DOJ000115 at 168.

[94] Ex. P67, I.R.M. 5.7.6.4(7) (requiring that the notice be delivered to the taxpayer "immediately"); Ex. P48, Government Response to Request for Admission 28.

[95] Ex. P53, CONTX00001 (showing postmark); Ex. P52, DOJ00115 at 168 (discussing mailing in June 2006).  This issue is disputed.  *See* Ex. P2, Government Response to Request for Admission 18; Ex. P54, Government Response to Request for Production 7.

[96] Ex. P55, CONTX05171; Ex. P56, Conway's Tax Court petition.  This is a disputed issue which is the subject of a separate proceeding.

[97] Ex. P4, Conway Dep. 157:24-158:15.

- Whether Conway received legal advice regarding the nature of the taxes due for the third and fourth quarters of 2001, when he received that advice, what the advice was, whether the advice was reasonable, whether Conway followed the advice, and whether the advice constitutes reasonable cause for nonpayment of National's tax liabilities for the third and fourth quarter of 2001.

- Whether National treated its excise tax liabilities for the third and fourth quarters of 2001 differently than its other "trust fund" tax obligations.

- Whether Conway acted with reckless disregard toward the tax liabilities at issue.

- Whether National had a solid business plan with potential for profit, whether National had a reasonable plan of reorganization, and whether National had a reasonable expectation of receiving funding from the ATSB.

- What the common understanding of the Stabilization Act was within National and within the airline industry generally.

## IV.  LAW AND ARGUMENT

### A.  This Case Is Inappropriate For Summary Judgment.

Summary judgment is proper when "there is no genuine issue as to any material fact," and "the movant is entitled to judgment as a matter of law."[98]  The Fifth Circuit has summarized the district court's standard of review of a summary judgment motion in a jury case:

> Before it can find that there are no genuine material factual issues, <u>the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party, or in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor.</u>[99]

In determining whether summary judgment is appropriate, a court should view all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.[100]  The moving party bears the burden of establishing that there are no genuine issues of material fact.[101]

---

[98] *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[99] *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citations omitted) (emphasis added).
[100] *Coleman v. School Bd. of Richland Parish*, 418 F.3d 511, 515-16 (5th Cir. 2005); *Trevino v. Celanese Corp.*, 701 F.2d 397, 407 (5th Cir.1983).
[101] *Norwegian Bulk Transp.t A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

Summary judgment is inappropriate when genuine factual disputes exist. "Litigants may not be cut off from their right to trial by jury if they really have issues to try."[102] There are numerous contested issues of material fact here which preclude summary judgment. In addition, the credibility of several witnesses, including Conway himself, is in dispute, and "assessing credibility is a delicate matter best left to the fact finder."[103] Additionally, because discovery from the Government is incomplete on several issues, the Court should deny this Motion under Fed. R. Civ. P. 56(f).[104]

> Further, summary judgment is generally improper for mixed questions of fact and law:
>
> Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.[105]

This case presents several mixed questions of law and fact.[106] In particular, "the issue [of] whether a person is responsible within the meaning of section 6672 presents a mixed question of fact and law."[107] In addition, the parties dispute whether Conway acted willfully or acted with reasonable cause, which are mixed questions of fact and law.[108] Issues of negligence

---

[102] *Harvey v. Great Atlantic &Pacific Tea Co.*, 388 F.2d 123, 124 (5th Cir. 1968) (internal citations omitted). *See also United States v. Burket*, 402 F.2d 426, 430 (5th Cir. 1968) ("It is not the purpose of Rule 56 to deny to litigants the right of a trial if they really have issues to try"); *Port of Palm Beach Dist. v. Goethals,* 104 F.2d 706, 709 (5th Cir. 1939) ("summary judgment under Rule 56 in a case at law where a jury has been demanded ought not to be given unless it is quite clear what the truth is") (under prior version of Fed. R. Civ. P. 56).

[103] *Yarn Processing Patent Validity Litig v. Leesona Corp..*, 498 F.2d 271, 288 (5th Cir. 1974).

[104] *See* Rule 56(f) Declaration.

[105] *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982) (internal citations omitted). *See also Yarn Processing Patent Validity Litig.*, 498 F.2d at 288 ("reasonable men might draw different inferences even from the same established facts. Therefore, the issue should be resolved by the fact finder after a full hearing of all the evidence rather than by summary judgment"); *Harvey*, 388 F.2d at 125 ("If reasonable minds could draw different inferences and reach different conclusions from the facts the issue must be reserved for trial") (internal citations omitted).

[106] *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) ("questions in which . . . the issue is whether the facts satisfy the statutory standard" are mixed questions of law and fact).

[107] *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990).

[108] Reasonableness is generally a mixed question of fact and law. *See, e.g., S. Ry. v. Tift*, 206 U.S. 428, 429 (1907) (whether a rate is reasonable is a question of fact mixed with law); *Sliwa v. Commissioner*, 839 F.2d 602, 605 (9th Cir. 1988) (reasonableness of IRS's position is a mixed question of law and fact); *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 803 (1st Cir. 1987) (citing *Cook v. Avien, Inc.*, 573 F.2d 685, 697 n.27 (1st Cir. 1978)) (question of reasonable diligence is a mixed question of law and fact).

and reasonableness generally are not issues which can be resolved through summary judgment because "the resolution of [these issues] requires the determination of the reasonableness of the acts and conduct of the parties under all the facts and circumstances of the case[.]"[109]

"The burden of showing the absence of a genuine issue of material fact falls squarely, and with great weight, upon the moving party."[110]  The Government cannot meet its burden here, and the Court should deny the Motion For Summary Judgment.

**B.    The Government Bears The Burden Of Proof And Has Not Met This Burden.**

In this case, the IRS imposed the trust fund recovery penalty under 26 U.S.C. § 6672(a), which is by its own terms a "penalty" under the Internal Revenue Code.  Section 7491(c)[111] places the burden of proof on the Government in penalty cases:

> (c) Penalties -- Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

The statute is clear and unambiguous on this point.[112]  Older Fifth Circuit case law also indicates that the Government bears the burden of proof in this type of case and bears the burden of proof on both willfulness and lack of reasonable cause.[113]  Moreover, because the Government bears the burden of proof here, the standard to obtain summary judgment is strict:    the

---

[109] *Gross v. Southern Railway Co.*, 414 F.2d 292, 296 (5th Cir. 1969) (internal citations omitted).  *See also Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 177-78 (5th Cir. 1990);

[110] *Pitts v. Shell Oil Co.,* 463 F.2d 331, 335 (5th Cir. 1972).

[111] References to "Section" throughout refer to sections of Title 26, United States Code, the Internal Revenue Code of 1986 as amended.

[112] The Government flatly misstates the law on this issue.  The Motion cites to Section 7491(a), which is not at issue, and cites to a case in which no party raised the issue of who bears the burden of proof.  *See Mason v. Commissioner*, 132 T.C. No. 14, 2009 WL 1227955 at n.5 (May 6, 2009) ("Neither party has raised any question concerning the burden or proof or burden of production in this case").

[113] *See Howard v. United States*, 711 F.2d 729, 733 (5th Cir. 1983) ("the IRS must show that the person assessed was a person responsible for the payment of those taxes who, without reasonable cause, willfully failed to collect, account for or pay over the taxes to the IRS") (emphasis added); *Newsome v. United States,* 431 F.2d 742, 746 (5th Cir. 1970) ("'reasonable cause' is part of the civil test in determining whether the failure to collect, account for, and pay over was willful"); *Frazier v. United States*, 304 F.2d 528, 530 (5th Cir. 1962) (same). Section 7491(c) was added to the Internal Revenue Code in 1998, so this case law is only persuasive authority.

Government must "make a showing sufficient for the court to hold that <u>no reasonable trier of fact</u> could find other than for the [movant]."[114]  The Government simply cannot meet this standard.

### C.    The Tax Periods At Issue Must Be Considered Separately.

The Government makes the extraordinary claim that, if it can establish Conway's liability for any tax period, it should win summary judgment for all of the tax periods at issue.  There is no support for this assertion.  The tax periods here are factually and legally distinct, and so are Conway's defenses.  In other cases presenting different defenses for different tax periods, the Fifth Circuit and other courts have considered each tax period separately.[115]  The Court should do the same here.

### D.    The Government Did Not Make A Timely Assessment.  In Any Event, Factual Disputes On This Issue Entirely Preclude Summary Judgment.

The Government's Motion does not seek summary judgment on the issue of whether the IRS timely and validly assessed the penalties at issue against Conway.  The circumstantial evidence strongly suggests that no such assessment occurred.  If no valid assessment occurred, the IRS cannot collect this penalty from Conway.  Because this is a contested issue which must be decided prior to any finding on the merits, summary judgment is improper.

In *Stallard v. United States,* the Fifth Circuit upheld the decision of the Western District of Texas that the IRS had failed to make a proper assessment of the trust fund recovery penalty.[116]  Like the present case, *Stallard* had a complex administrative history involving

---

[114] *Mary Kay, Inc. v. Weber,* 601 F.Supp.2d 839, 851 (N.D. Tex. 2009) (emphasis added) (holding that the a movant bearing the burden of proof on an issue "must come forward with evidence that establishes 'beyond peradventure all the essential elements of their claim or defense to warrant judgment in their favor'") (citing and quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

[115] *See Gustin v. United States*, 876 F.2d 485, 491 (5th Cir. 1989); *Vinick v. United States*, 205 F.3d 1, 11 and n.8 (1st Cir. 2000) (stating [r]esponsibility during one period does not equate to responsibility in all periods); *Caterino v. United States*, 794 F.2d 1, 4 (1st Cir. 1986); *Moulton v. United States*, 2003 U.S. Dist. LEXIS 22007, 15-16 (D. Mass. 2003); *Cline v. United States*, 997 F.2d 191 (6th Cir. 1993); *Schweitzer v. United States*, 193 F. Supp. 309, 312 (D. Neb. 1961).

[116] *Stallard v. United States,* 12 F.3d 489 (5th Cir. 1994).

multiple tax periods.[117]   The IRS assessed the trust fund recovery penalty for the wrong tax period and did not correct the error until after the limitations period expired.[118]   In addition, IRS issued two liens against taxpayer—one for the correct period and one for the wrong period.[119] The IRS never made an assessment for the correct period.[120]   The Fifth Circuit affirmed the decision of the Western District of Texas that the assessment was invalid.[121]   The Fifth Circuit noted that taxpayer had suffered harm by the issuance of a needless, additional tax lien.[122]

Moreover, in *Boyd v. United States*, the district court held that summary judgment on the timeliness and validity of an assessment was inappropriate due to unresolved factual disputes.[123] In that case, the Government offered an affidavit which purported to establish that the IRS had assessed the amounts at issue within the statutory deadline.[124]   The Government did not offer the assessment record or prove that the assessment had been signed by the designated assessment officer.[125]   As such, the Government was not entitled to summary judgment on this issue.[126]

As discussed in the statement of facts, the evidence strongly suggests that the IRS made either an invalid or untimely assessment against Conway.   In any event, this evidence creates a genuine factual dispute precluding summary judgment on all issues in this case.

### E.    Conway Is Not A Responsible Person For The Tax Periods At Issue. However, Factual Disputes Preclude Summary Judgment On This Issue.

Responsibility for purposes of the trust fund recovery penalty is a matter of status, duty and authority.[127]   "The central question is whether an individual <u>had the effective power to pay</u>

---

[117] *Id.* at 491.
[118] *Id.* at 492.
[119] *Id.*
[120] *Id.*
[121] *Id.* at 496.
[122] *Id.* at 495.
[123] *Boyd v. United States,* 439 F.Supp. 907, 910 (E.D. Pa. 1977).
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Howard*, 711 F.2d at 734.

taxes."[128]   However, access to corporate funds is not enough to prove that an individual was a "responsible person" for purposes of the trust fund recovery penalty.[129]

In this case, the Government argues that Conway is a "responsible person" because he had the ability to pay National's taxes at some generalized point in time.  This argument ignores the context in which National's tax liabilities accrued.  In light of the restrictions imposed by National's bankruptcy, Conway lacked the effective power to pay the taxes at issue.

### 1.    Restrictions On Payment Of Excise Taxes For The Third Quarter Of 2000.

A debtor-in-possession like National Airlines is <u>prohibited</u> from paying any claims or debts incurred prior to the petition date unless it obtains approval from the bankruptcy court.[130]  An excise tax claim is considered a "pre-petition" claim if it is "an excise tax on a pre-petition transaction[.]"[131]  These claims are considered eighth in priority for payment.[132]

Corporations often pay their pre-petition trust-fund tax liabilities prior to filing for bankruptcy to avoid the priority issues in the bankruptcy process.[133]  National was concerned about its pre-petition trust-fund tax liabilities at the time of filing for bankruptcy.  National attempted to pay the third quarter of 2000 liability prior to the filing for bankruptcy in December 2000, but the account on which the check was drawn was closed.[134]  Additionally, National filed

---

[128] *Gustin v. United States*, 876 F.2d 485, 491 (5th Cir. 1989).

[129] *Id.* at 492 ("Requiring an employee to pay over taxes when he does not have the actual authority to do so would be tantamount to requiring any employee with mere access to company funds to steal funds that the company owes the government. Section 6672 does not impose such a responsibility upon any corporate employee").

[130] 11 U.S.C. § 362; *See In re Bulk Transp., Inc.*, 23 B.R. 538 (Bankr. E.D. La. 1981) (holding payment of pre-petition employment tax liabilities during automatic stay was voidable).

[131] 11 U.S.C. § 507(a)(8)(E). In addition, claims arising from taxes "required to be collected or withheld and for which the debtor is liable in whatever capacity" are also eighth priority claims. 11 U.S.C. § 507(a)(8)(C).

[132] *Id.*

[133] BNA Portfolio 790-1st, *Corporate Bankruptcy* at III.C.3 ("The debtor corporation should estimate the amount of such taxes and pay them before filing its petition for bankruptcy.  In addition, at the commencement of the debtor's bankruptcy case, the debtor should file a first-day motion to pay any unpaid pre-petition trust fund tax liabilities since those taxes should not be considered property of the bankruptcy estate").

[134] *See* supra at III.B.1.

a first-day motion requesting leave to pay pre-petition wages.[135]  One goal of this motion was to satisfy National's pre-petition payroll taxes, which are also trust-fund taxes.  When National learned of the unpaid check for the third quarter of 2000 taxes, Conway listed this liability in National's bankruptcy filings as a pre-petition liability and included it in National's plans for reorganization.  While the company was operating, Conway had no ability to pay this debt.

### 2.    Restrictions On Payment Of Excise Taxes For The Third And Fourth Quarters Of 2001.

Taxes accruing and due after the date on which the debtor files a petition for bankruptcy are post-petition taxes classified as "administrative expenses."[136]  Requests for payment of administrative expenses are considered second in priority, paid before any pre-petition claims.[137]  Without violating the priority rules, the debtor-in-possession can pay administrative expenses without court approval if they are in the "ordinary course of business[.]"[138]  There is no requirement that any particular administrative expense be paid under Section 363(c)(1).[139]  If the debtor has not paid the expense, the creditor must file a request for administrative expenses prior to the bar date.[140]  After notice and hearing, the request will be allowed if it is properly classified as an administrative expense.[141]

---

[135] Ex. P57, Bankr. Rec. Doc. No. 25 (order granting motion).

[136] 11 U.S.C. § 503(b)(1)(B)(i).

[137] 11 U.S.C. § 507(a)(2).

[138] 11 U.S.C. § 363(c)(1).  This statute refers to the powers of the "trustee," but these powers apply equally to a debtor-in-possession.  See 11 U.S.C. § 1107(a).

[139] *See, e.g., In re Unitcast, Inc.*, 214 B.R. 1010 n.1 (Bankr. N.D. Ohio 1997) ("[t]he payment of postpetition taxes is not, however, mandated by § 363(c)(1)").

[140] 11 U.S.C. § 503(a).

[141] 11 U.S.C. § 503(b). The IRS filed a claim for administrative expenses for these taxes, but there is a factual dispute regarding when this occurred.  Although the claim is dated March 15, 2002, it does not appear on the bankruptcy court's docket until December 2003.  Ex. P58, CONTX04903; Ex. P59, Bankr. Rec. Doc. No. 1644.  Also, the IRS reached a stipulation with the Chapter 7 trustee regarding the claim, but did so in 2005 well after National's assets had been depleted.  Ex. P60, Bankr. Rec. Doc. No. 1818.  In fact, the Chapter 7 trustee sent a letter to the IRS noting that this was the only unresolved claim remaining.  Ex. P61, DOJ-NB-00900.

A debtor-in-possession is generally authorized to continue the day-to-day operations of its business, but it cannot enter into non-ordinary-course transactions without bankruptcy court approval.[142]  As discussed by the bankruptcy court in *In re Unitcast, Inc.:*

> § 363(c)(1) does not mandate payment in the ordinary course of business, but only provides that the trustee (or debtor-in-possession) "may" use property in the ordinary course of business.  Section 363(c)(1) contemplates that payments will be made and transactions will be entered into in the ordinary course of business when the trustee (or debtor-in-possession) decides that doing so is in the best interests of the bankruptcy estate.[143]

In *Unitcast*, the IRS argued that the debtor-in-possession should have been ordered to pay post-petition taxes as payments in the "ordinary course of business" under 11 U.S.C. § 363(c)(1).[144]  The court rejected this argument, reasoning that such an order would give the IRS a super-priority in bankruptcy to which it was not entitled.[145]

There is no definition of "ordinary course of business" in the Bankruptcy Code.  Collier's treatise gives the following guidelines to determine whether a transaction is in the ordinary course of business, including 1) whether the transaction is similar to transactions in which comparable businesses engage in their day-to-day operations; 2) whether the transaction is similar to transactions in which the debtor engaged on a day-to-day basis prior to filing; or 3) whether the transaction will have a substantial impact on the Chapter 11 case or the debtor's business, including examination of the nature of the transaction and its size.[146]

In light of these guidelines, Conway could not have paid the excise taxes for the third and fourth quarters of 2001 when they became due on January 15, 2002 in the "ordinary course of business" under 11 U.S.C. § 363(c)(1).  Given the events of 9/11, the deferral set forth in the Stabilization Act, and the size of an $8 million lump-sum payment, there was nothing "ordinary"

---

[142] 11 U.S.C. § 363(c)(1-2).
[143] *In re Unitcast, Inc.,* 214 B.R. at 1018.
[144] *Id.* at 1017.
[145] *Id.*
[146] 7 Collier's on Bankruptcy § 1108.02[4] (15th ed. rev'd 2002).

about these payments. National typically paid its excise taxes in small, semi-monthly payments rather than a lump sum each quarter, so this payment was unlike excise tax payments it had made before.[147]  Also, as discussed above, National could not make the payments on the deferral date. Thus, Conway had to obtain court approval to pay these debts.

In summary, the Government has failed to demonstrate conclusively that Conway had the effective power to pay the taxes at issue.  As a mixed question of fact and law presenting genuine factual disputes,[148] the issue of whether Conway was a "responsible person" under Section 6672 is not proper for summary judgment.

> **F.    Conway Acted With Reasonable Cause And Did Not Act Willfully, Precluding Summary Judgment On This Novel, Mixed Question Of Fact And Law.**

The Government argues in its Motion that, because National owed the taxes at issue, Conway now owes the trust fund recovery penalty for them.  However, Section 6672 is not a strict liability statute.   The penalty is distinct from the employer's liability for these taxes.[149] The Supreme Court has stated that "[t]he fact that [section 6672] imposes a 'penalty' and is violated only by a 'willful failure' is itself strong evidence that it was not intended to impose liability without personal fault."[150]  To succeed on the present Motion (and at trial), the Government must prove conclusively that Conway acted both willfully and without reasonable cause.[151]  Both of these are fact-intensive inquiries that cannot be resolved by summary judgment in a complex and

---

[147] Ex. P6, Frost Dep. 27:1-28:17 (describing National's semi-monthly excise tax payments pursuant to IRS regulations).

[148] *See Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir. 1990) (holding that the question of whether a person was "responsible" under Section 6672 was a mixed question of law and fact).

[149] *Newsome v. United States,* 431 F.2d 742, 745 (5th Cir. 1970).

[150] *Slodov v. United States*, 436 U.S. 238 (1978) (emphasis added).

[151] *See Howard v. United States*, 711 F.2d 729, 733 (5th Cir. 1983) ("the IRS must show that the person assessed was a person responsible for the payment of those taxes who, without reasonable cause, willfully failed to collect, account for or pay over the taxes to the IRS") (emphasis added); *Newsome,* 431 F.2d at 746 ("'reasonable cause' is part of the civil test in determining whether the failure to collect, account for, and pay over was willful"); *Frazier v. United States*, 304 F.2d 528, 530 (5th Cir. 1962) (same).

novel case like this one.  The evidence shows that Conway acted with reasonable cause and not willfully, and was not at personal fault in this difficult situation.

### 1.    Conway Did Not Act Willfully Or Recklessly.

"Mere negligence . . . does not establish willfulness under [Section 6672]."[152]  In *Gustin*, the Fifth Circuit held that judgment as a matter of law was improper and that an officer's actions were not "willful" regarding one tax period because his conduct was not reckless.[153]  The officer was the president of a corporation which failed to pay income taxes for the third and fourth quarters of 1981.[154]  When the IRS notified the corporation that its third-quarter withholding taxes were delinquent, the officer notified the owners of the corporation who usually paid the taxes.[155]  The officer set up a meeting with the owners of the corporation and the IRS, but he was not allowed to attend the meeting.[156]  The officer resigned in January of 1982, and argued that he did not know about the liabilities for the fourth quarter of 1981.[157]  Because of jurisdictional problems, the court only considered the officer's liability for this quarter.[158]  Although the court held that the officer was a responsible person, his conduct was not willful:

> Given that the company had not been delinquent on their taxes in prior quarters, that Gustin made every reasonable effort to see that the third quarter taxes were paid, that he was repeatedly promised by the owners of the corporation that the taxes would be paid and that he had no reason to believe that the meeting between Internal Revenue Service agents and the owners of the corporation had not resolved the third quarter delinquency, we hold that . . . Gustin's actions regarding the fourth quarter taxes [cannot] be characterized as reckless.[159]

The Fifth Circuit reversed the district court's judgment for the Government on this quarter.[160]

---

[152] *Gustin v. United States*, 876 F.2d 485, 492 (5th Cir. 1989).
[153] *Id.* at 492-93.
[154] *Id.* at 487.
[155] *Id.* at 487.
[156] *Id.*
[157] *Id.* at 493.
[158] *Id.* at 491.
[159] *Id.* at 493.
[160] *Id.*

In another case, *Tozier v. United States*, the officers were held not to have acted willfully because they made all reasonable efforts to secure corporate assets for the IRS despite the IRS's total inaction.[161]  The corporation was in distress, and, due in part to its tax liabilities, intended to liquidate.[162]  The officers notified the IRS that the corporation would file for bankruptcy shortly and that they would make available all of the corporate assets for levy by the IRS.[163]  This notice was given several times, and the IRS seized certain assets.[164]  The IRS sold some of these assets cheaply and released its liens and levies on other assets to the jurisdiction of the bankruptcy court.[165]  The officers had no control over these decisions.[166]  The court held that the failure of the IRS to collect the taxes was due to its own conduct and not that of the corporate officers.[167]

One area of significant factual dispute is whether Conway had any "unencumbered" funds at his disposal to pay the excise taxes at issue.  The Fifth Circuit has held as follows:

> A responsible person who learns of the underpayment of taxes must use later-acquired unencumbered funds to pay the taxes; failure to do so constitutes willfulness. Funds are encumbered for this purpose only if they are subject to restrictions imposed by a creditor with an interest superior to the IRS that preclude the taxpayer from using the funds to pay the taxes.[168]

In one recent case, the Fifth Circuit held that summary judgment was improper where an officer had called facts into dispute regarding whether corporate funds were encumbered.[169]

Due to the restrictions placed on National's ability to pay creditors during the bankruptcy and National's lack of funds, Conway had no "later-acquired unencumbered funds" at his disposal to pay the taxes at issue.  The extraordinary nature of the $8 million excise tax payment for the third and fourth quarters of 2001 precluded Conway from making this payment in the

---

[161] *Tozier v. United States,* 16 AFTR 2d 5626 (D. Wash. 1965).
[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Logal,* 195 F.3d at 232.
[169] *Speer v. United States*, 2000 WL 554432 (5th Cir. 2000) (per curiam) (unpublished disposition).

ordinary course of business.  This became an "administrative expense" subject to second priority in the bankruptcy, and was dealt with in Chapter 7 after Conway had left the company.  There were numerous second priority claimants, many of which had claims in excess of the amounts due to the IRS here.[170]  All of these claims were subject to approval by the bankruptcy court.[171]  Moreover, unlike the IRS, which was the last administrative-expense creditor to resolve its claim, most of these second priority claims were resolved promptly once National's case was converted to Chapter 7.[172]  In addition, the liability for the third quarter of 2000 was an eighth-priority debt, as discussed above.[173]  As such, there were even more creditors superior to the IRS regarding this debt.  Therefore, no unencumbered funds were at Conway's disposal to pay the taxes at issue, and Conway did not act willfully.

## 2.    Conway Received Advice Not To Pay The Taxes As They Came Due, and At All Times Acted With Reasonable Cause.

The Fifth Circuit has long recognized that a taxpayer acting with "reasonable cause" is not subject to the trust fund recovery penalty under Section 6672.  In particular, the Fifth Circuit has observed that the following conditions may amount to reasonable cause:

> The term "reasonable cause" has been interpreted as advice by counsel under certain circumstances not to pay the withheld taxes as they became due; advice of non-collection by attorney and tax collector; advice by counsel that there was no tax liability.[174]

The Fifth Circuit discussed the contours of the "reasonable cause" defense in *Newsome*.

In that case, the officer unsuccessfully argued that his conduct was not willful because he relied

---

[170] *See* Ex. P62, Bankr. Rec. Doc. No. 1594 (showing administrative expense claims, <u>not</u> including the IRS's claim, totaling $160,547,077); Ex. P63, Bankr. Rec. Doc. No. 1651-1 (adding an additional $12 million in claims, including the IRS's claim, for a total of $173,081,695).  In January 2004, the bankruptcy court approved $108 million of these claims, but did not approve the IRS's claim.  Ex. P64, Bankr. Rec. Doc. No. 1666.  Even these allowed claims far exceeded National's assets.  In its monthly operating report for the month ended March 31, 2003, National listed its assets as $85 million and its liabilities as $278 million.  Ex. P65, Bankr. Rec. Doc. No. 1473.
[171] *See* Ex. P64, Bankr. Rec. Doc. No. 1666 (approving claims).
[172] Ex. P61, DOJ-NB-0900 (letter to IRS stating that its claim was the last to be resolved).
[173] *See* Ex. P65, DOJ-NB-00958 (showing other pre-petition debts exceeding the IRS's claim for the third quarter of 2000).
[174] *Newsome,* 431 F.2d at 748 n.12 (internal citations omitted).

on the advice of his corporation's attorneys and accountants.[175]  The Fifth Circuit found the facts presented to be insufficient to establish reasonable cause, but noted that the outcome could have been different under another set of facts:

> Newsome was not advised, nor did he interpret the advice as meaning, that he had been justified in using withheld taxes during December and January to pay other creditors or that he should continue to pay creditors with funds then available or that might become available instead of paying the government.[176]

In contrast to *Newsome*, Conway received advice to pay other creditors instead of the IRS.[177]

In a similar case, *Gray Line Co. v. Granquist*, the Ninth Circuit held that the taxpayer had acted with reasonable cause.[178]  The corporation in that case ran a limousine service between downtown Portland, Oregon and the airport.[179]  The IRS argued that the corporation was subject to transportation taxes on its services and assessed the amounts.[180]  Prior to assessment, the IRS sent the corporation a letter advising that it should collect these taxes.[181]  However, the corporation had received advice from its own counsel and from the Special Deputy Tax Collector that it was not required to pay the tax.[182]  The corporation demonstrated that it relied on this advice.[183]  The Ninth Circuit held that the corporation had acted with reasonable cause in relying on the legal advice it had received.[184]

A district court also found reasonable cause in *Anderson v. United States*.[185]  The corporation at issue suffered a financial setback, and the president consulted corporate counsel, who advised filing for bankruptcy.[186]  Corporate counsel advised that the IRS would enjoy a

---

[175] *Id.* at 747.
[176] *Id.* at 747-48 (emphasis added).
[177] *See* supra at III.B.3-5.
[178] *Gray Line Co. v. Granquist,* 237 F.2d 390, 395 (9th Cir. 1956).
[179] *Id.* at 392.
[180] *Id.* at 393.
[181] *Id.* at 393.
[182] *Id.* at 395.
[183] *Id.*
[184] *Id.* at 392 (cited with approval in *Newsome v. United States,* 431 F.2d. 742, 748 n.12 (5th Cir. 1970)).
[185] No. 77-19303, 1977 WL 1252, *4 (W.D. La. Sept. 22, 1977).
[186] *Id.* at *1.

preference in the bankruptcy and that the taxes would be paid as a matter of course.[187]  At the time of filing the petition, the corporation had funds to make a partial payment to the IRS, but corporate counsel advised against paying any creditors including the IRS.[188]  The IRS failed to file a proof of claim before the bar date set by the court.[189]  When the claim was filed, the bankruptcy court rejected it as untimely.[190]  The court found that the president had acted with reasonable cause in relying on the advice of corporate counsel.[191]

As in *Gray Line* and *Anderson*, Conway acted with reasonable cause and not willfully regarding the relevant tax periods because he relied on the advice of counsel not to pay the liabilities as they came due.  Moreover, Conway did not act with "reckless disregard" toward the tax periods at issue, and, accordingly, did not act willfully.

### 3.    Conway Acted With Reasonable Cause And Not Willfully Regarding National's Unpaid Excise Taxes For The Third Period Of 2000.

Conway acted reasonably and not willfully at all times regarding National's excise taxes for the third quarter of 2000.  He reasonably believed that the excise taxes had been paid prior to National's filing for bankruptcy.  Further, he properly reported the liability as a pre-petition liability to the bankruptcy court and included the debt in National's plans for reorganization and pitches to investors.  He reasonably believed the debt had been satisfied when National's case was converted to Chapter 7.

In other cases, when an officer mailed a check in good faith to the IRS, and that check subsequently bounced due to an intervening bankruptcy filing, courts have held that this is evidence that the officer did not act willfully.[192]  For example, in *Dooley*, a company sent a

---

[187] *Id.* at *3.
[188] *Id.*
[189] *Id.*
[190] *Id.*
[191] *Id.* at *4.
[192] *See Dooley v. United States*, No. 90-cv-71348, 1992 WL 88136 (E.D. Mich. Jan. 24, 1992) (rejecting summary judgment motion on this basis); *Moody v. United States*, 275 F.Supp. 917, 926 (E.D. Mich. 1967) (finding

check to the IRS for payment of tax.[193]  The company filed for bankruptcy shortly thereafter and closed the account on which the check was drawn.[194]  The check bounced.[195]  The district court held that this was sufficient evidence to survive summary judgment on willfulness.[196]

Moreover, Conway continued to act reasonably and not willfully regarding this tax period until he left National.  In early 2003, National submitted a check for final payment of this quarter, and Conway reasonably believed this debt had been fully paid.

### 4.    Conway Acted With Reasonable Cause And Not Willfully Regarding National's Unpaid Excise Taxes For The Third And Fourth Quarters Of 2001.

In every other situation in Conway's career—during America West's bankruptcy in the 1990s, for the majority of the third quarter of 2000, and in the second quarter of 2002—Conway paid delinquent excise taxes to the IRS.  There is a clear distinction between ordinary excise taxes and the taxes which accrued in the two quarters after September 11, 2001.  For these quarters, Conway received advice not to pay the taxes as they came due because of the Stabilization Act.  To mount a defense of reasonable cause, the taxpayer is not required to challenge his legal advisor's conclusions or check the advice himself.[197]  By relying on the advice of National's bankruptcy counsel, Conway acted with reasonable cause and not willfully regarding these quarters.  National's counsel's advice was reasonable under the circumstances.

Passed shortly after September 11, 2001, the Stabilization Act provided immediate funds to the airlines by allowing them to use excise taxes held in trust for the Government for the

---

insufficient evidence of willfulness in a case involving a bounced check to the IRS due to the shutdown of the business).

[193] *Dooley,* 1992 WL 88136 at *1.

[194] *Id.*

[195] *Id.* at *2.

[196] *Id.* at *5 n.4.

[197] *United States v. Boyle*, 469 U.S. 241, 251 (1985) ("To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place"); *Streber v. Commissioner*, 138 F.3d 216, 223 (5th Cir. 1998); *Durrett v. Commissioner*, 71 F.3d 515, 518 (5th Cir. 1996); *Chamberlain v. Commissioner*, 66 F.3d 729, 733 (5th Cir. 1995).

airlines' operating expenses.    Under these unique and unprecedented circumstances, it was reasonable to conclude that the effect of the Stabilization Act was to dissolve the "trust" attached to these taxes.  In fact, Conway received advice not to pay these quarters as they came due and treated these taxed differently than other "trust fund" taxes remitted to the IRS.

As discussed in Plaintiff's statement of facts, the purpose of the Stabilization Act was to provide stability and revitalization to the airline industry through providing short- and long-term cash assistance to the airlines.  The specific purpose of the deferral of excise tax payments was to provide working capital for operating expenses, and this purpose was also well-known and well-documented.  If Congress wanted to provide a simple extension of filing or payment deadlines, it could have limited Section 301 of the Stabilization Act to businesses experiencing administrative difficulties.[198]   Instead, the Stabilization Act was intended to provide financial relief to the airlines.[199]

Because of this stated purpose, Section 301 of the Stabilization Act could be reasonably interpreted to have dissolved the "trust" which applied to the 9/11 excise taxes.  The Internal Revenue Service places taxes collected pursuant to Section 6672 in "a special fund in trust for the United States."[200] Since the funds are held in trust, they may not be used by the corporation as working capital because "the government cannot be made an _unwilling_ partner in a floundering business."[201]

In this way, Conway's case diverges from the normal trust fund recovery penalty case: Section 301 of the Stabilization Act made the Government a _willing_ partner in struggling

---

[198] In fact, Congress and the Treasury Department took exactly this step for individual taxpayers suffering from administrative delays due to disruptions caused by September 11.  _See_ 26 U.S.C. § 7508A (authorizing the IRS to postpone deadlines for taxpayers affected by Presidentially declared disasters); I.R.S. Notice 2001-61 (postponing filing deadlines for individuals affected by September 11).
[199] Upon information and belief, the IRS returned excise tax deposits made by certain airlines during the deferral period.  Discovery on this issue is incomplete, as discussed in the Rule 56(f) Declaration.
[200] _Slodov v. United States_, 436 U.S. 238, 239 (1978).
[201] _Collins v. United States_, 848 F.2d 740, 741-42 (6th Cir. 1988) (emphasis added).

airlines.  The statutory trust which applies to excise taxes under Section 7501 is created when the relevant payments from the airlines' customers are made to the airline.[202]  But Section 7501 provides no authority for when the taxes lose their trust fund character.  In the absence of statutory guidance, common-law trust rules can be applied to federal trust-fund tax questions, which dictate a finding of no liability for the trust fund recovery penalty in this case.[203]

Thus, the idea that the Stabilization Act transformed the excise taxes accruing after September 11 from "trust fund" taxes into a short-term loan to the airline industry was based on a reasonable interpretation of the law, was the common understanding within the airline industry itself, and was consistent with the way these excise taxes were treated by Conway and National. National's bankruptcy counsel gave reasonable advice to Conway not to pay the taxes at issue, and Conway relied on this advice. As such, Conway acted with reasonable cause and not willfully for the two tax periods following September 11, 2001.

Conway otherwise acted reasonably and not willfully regarding the 9/11 taxes.  Beyond the question of what advice Conway received, Conway otherwise acted reasonably and not willfully for these quarters.  As discussed, Conway had no authority to pay these liabilities because they did not qualify as expenses in the ordinary course of business.  Conway reported the liabilities to the bankruptcy court in National's monthly operating reports and included them in National's plan of reorganization.  Conway also directed National's employees to keep the IRS fully informed of the liabilities and of National's efforts to repay the debts.

---

[202] *Begier v. United States*, 496 U.S. 53, 60 (1990).

[203] *See Slodov*, 436 U.S. at 256 (applying an "accepted principle of trust law" in a trust-fund tax case).  *See* RESTATEMENT (SECOND) OF TRUSTS § 342 (1959), which deals with conveyances by the trustee (here, National) at the direction of the beneficiary (here, the IRS):

> If there is a sole beneficiary who is not under an incapacity and the trustee transfers the trust property to him or at his direction, or if there are several beneficiaries none of whom is under an incapacity and the trustee transfers the trust property to them or at their direction, the trust terminates although the purposes of the trust have not been fully accomplished.

(emphasis added).  The Commentary to this section further provides that "[i]f the trustee transfers the trust property to a third person with the consent of the beneficiary who is not under an incapacity, the trust is terminated and the trustee is under no liability for making the transfer." *Id.* (emphasis added).

In summary, Conway acted reasonably and not willfully toward the three tax periods at issue, and should not be held liable for the trust fund recovery penalty for these quarters. However, factual disputes preclude summary judgment on this issue at this time.

**V.      CONCLUSION AND PRAYER FOR RELIEF**

WHEREFORE, for all these reasons, the Court should deny the Government's Motion for Summary Judgment. Conway additionally requests all such further legal and equitable relief to which he may be entitled.

Respectfully submitted,

/s/ Laura L. Gavioli
M. Todd Welty
Texas State Bar No. 00788642
Laura L. Gavioli
Texas State Bar No. 24055538
Sonnenschein Nath & Rosenthal LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201-1858
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
twelty@sonnenschein.com
lgavioli@sonnenschein.com

ATTORNEYS FOR PLAINTIFF
MICHAEL J. CONWAY

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October 2009, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which will send notification of the filing to all counsel of record.

/s/ Laura L. Gavioli
Laura L. Gavioli

14821125